Case number 21-6118, Charles Stein v. Christopher Gunkel et al. Arguments not to exceed 15 minutes per side. Mr. Pugh, you may proceed for the appellant. Good morning, your honors. Mr. Mando, may I please the court? I'd like to reserve three minutes of rebuttal time. With the court's permission, I want to focus first on the facts and the objective component. I know that there's an elephant in the room with Kingsley, Brawner, and his progeny, Green, Westmoreland, and Trozzi. But first, we really need to address the facts and whether or not there is an objective issue here. And I think that there is. First, we need to talk about when Webster, the assaultive inmate, came into the jail. He came in 20 minutes prior to Stein. He was wheeled in in a wheelchair with blood on his face. Now, during the intake questions, well, first, let's not forget, Defendant Sterling has no recollection of the booking process. Well, I will not disagree with your elephant in the room point, but can you help me? I think I understand the facts. Can you help me understand what the legal point you're making? What's the objective inquiry that you're saying we should be asking? And what facts can we consider when we ask that question? Right, well, did Webster pose an objectively serious risk of harm to inmates? And as part of that analysis, can we look at all the facts that were known to the officer at the time? Well, and that's yes, but that's also a strange issue here because she doesn't remember. So we can only imply what she knew or should have known based on the facts before her, right? So we can't even rely on our memory. So it's everything that's in the record. It's the NCI. As a baseline rule, do you agree that we can consider what that officer knew at the time and then apply that, look at that from an objective lens? Well, right. I understand the fact specifics. You seem to be distinguishing this case from the rule or acknowledging the rule but saying there was nothing that she knew or she had forgotten the facts. So it's a credibility issue or something I understand you're raising. Right, and I don't want to get lost in the weeds on the test because I'd want to address that later. Sorry, I hate to. No, it's okay. Mr. Pugh, rather than us wandering around in all of this stuff, could you simply start out by stating exactly what you claim Sterling and Gunkel either did wrong or failed to do that they should have done that rises to the recklessly disregarded standing standard? They failed to classify him as maximum risk based on the facts, the objective facts that were before them. Now, I might be doing a pawn sacrifice with Gunkel, and I'll talk about that in a bit, but when you have these kinds of objective facts in front of you, you have an NCIC report that says Gunkel recognized that Sterling failed to use a drug. He actually then changed it to increase the security level for Webster, right? Well, no, Your Honor, because actually Webster had the same classification that Stein had that was high risk based on either medical needs or suicidal ideation. In the case of Stein, the plaintiff, which is just for an example purposes, he presented some suicidal ideation, so they put him in high risk based on that suicidal ideation. Webster was wheeled in in a wheelchair. So Gunkel isn't the one that did the initial screening. No, he does not. So Sterling did. Sterling did. The crux to the case is Sterling should have assigned a different classification. Correct. Now, the different classification wouldn't have gotten this guy in a different cell at the time than he ended up in anyway, right? When he was booked. When he was booked, no, it would not have put him in a different cell, but if he had been properly classified as what we're talking about, any subsequent move, there would have been a red flag. You mean she should have put some note in there that he was dangerous. Correct. Not just had a medical issue. Right. But was posed a danger to other inmates or law enforcement personnel and it should have been noted somewhere in the system so that when somebody else went in later to change the classification, they would have looked at it and said, oh, this guy is dangerous, we shouldn't put him in another cell with another person. Correct, Your Honor. Okay. And she actually addressed this in her deposition at page ID. Do you agree that she needs to be at least reckless? She can't be merely negligent, right? No. She has to be reckless. That's the standard. Okay. So we're really trying to look at to what degree do we constitutionalize booking mistakes. So what converts this from, let's just assume for a moment she was negligent, what converts this using the recklessly disregarded standard under the facts of this case to a constitutional tort? When there's so much objective information in front of her that she knows or should have known that this guy didn't need to be going in with other inmates. I mean, because he was a serious security risk to other inmates. He was assaultive. He was at St. Elizabeth for a mental health evaluation. He assaulted a guard at the hospital, which is in the citation. The officers struggled to restrain him. Now, what information she didn't have in front of her, but she would have had if she did an inquiry is that one of the officers had to get stitches. But did she just make a mistake, or are you saying that she looked at the information and made the wrong call, like made a conscious decision not to say that he was dangerous and just made a judgment error, or did she just, I don't know, make a mistake? She didn't see it. She didn't look at it. She didn't what? There's no way she shouldn't have looked at it. She should have looked at it. She had it in front of her. That's her obligation is to look at it and to make an inquiry. So it's not just a mistake. It's having that information in front of you and being like, meh, it doesn't matter. That's what happened here. And if you look at when the warrant is booked into the system by Sterling, that's immediately when Webster is coming into the facility. So the NCIC printout, she's got the warrant. She's reading it. Warning, caution, assaultive, violent tendencies. She's got that information. And at 5 a.m., she's entering in that citation, that other citation, from St. Elizabeth, where it's got menacing and resisting arrest, and it talks about Webster being Can I ask a couple legal questions? Sure. So you just told us the standard should be recklessness. Westmoreland uses the word intentional. Well, right. And that's where we're going to get into a lot of that stuff with Kingsley, Webster, Green, Trozzi, and Westmoreland. So the problem that I see with just putting in some kind of intentional issue is that that's almost just like a farmer analysis. So how is that any different than farmer? Well, this is what Judge Gibbons' opinion in Westmoreland. This is what Judge Gibbons said. She used the word intentional. Right. Prong? It's a hard, you know, it's very, I completely, let me ask you a different question. I think this is really complicated. It is. Wouldn't it be easier for us to maybe look at the clearly established prong? What's your best case that why this conduct was clearly established to be deliberate? Richco. Richco, right. So Richco is about a mental health officer or someone with mental health training. Richco to me seems more like when Webster gets to the facility, he meets or he's evaluated by a medical professional or a nurse or someone who has mental health training. Eventually based on suicidal ideation. Yes. And that person could have told one of the booking officers, Sterling, this person is a dangerous person. Don't put him in a cell with another individual. I don't believe that's in the record, Your Honor, but I don't know that she's even got the power because there's two different, because I hear what you're saying about classification, but there's two different classifications. There's the booking classification and then a classification 72 hours later. I guess what, I mean, Richco, right. Richco is about someone who is trained in mental health, the area of mental health, was evaluating someone sort of for that purpose and kind of gave the wrong answer. But here Webster was evaluated by someone who could have assessed his propensity for attacking a fellow cellmate and said nothing, or certainly said nothing to Sterling about that. So Sterling didn't actually personally evaluate Webster in the way that Richco, the defendant there, evaluated. Is it Richco, I guess, or I forget. I'm going to disagree with you there, Your Honor. I expect you to. So it's not about whether or not he was a mental health professional. It's whether or not he observed the objective information in front of him and then did an additional inquiry because he's got other entries in the mental health database. So with Sterling, she's got this information in front of her, and this is her responsibility at booking. Because if you listen to Gunkel, Gunkel is saying, hey, you can't change classification once it's done, right? That's what he's saying. So the responsibility is all on Sterling because the only next classification is 72 hours later. What was the rule that was clearly established? What's the farmer rule that was clearly established with respect to Sterling? That Sterling had to go beyond whatever information was given to her by the initial mental health evaluation and do what? No. Actually, Sterling doesn't have to go beyond the mental health evaluation. Your Honor, to be honest, with the NCIC print-off, I would like to just take the mic and drop it. You've got felony second, assaultive behavior, caution, assaultive tendencies, or danger to others. But you amplify that by that second citation that comes in, which he enters in at 5 o'clock, which was when he was at St. Elizabeth Hospital. He is fighting other people that night. So that information – But weren't those guards? Weren't those security guards he was fighting? No. He was a police officer, too. The citation – Well, either way. That seems different to me than a cellmate. Attacking someone who's trying to restrain you or arrest you seems very different to me than at risk to a cellmate. Well, Your Honor – The issue we're supposed to look at here. If you look at document 21-1, page ID 102, when you're looking at the risk needs assessment, which this is a classification document that's used at booking and in subsequent classifications, assaultive defense, assaultive history, escape threat, holder, assaultive history, then you put them in maximum. I guess I would think, I don't know for certain, but I think at most facilities there are a lot of people who are brought there who have committed some violent crime and maybe resisted arrest or fought with the officers or ran away and had to be tackled. So this case is not unlike a lot of cases, it seems like. So this is a pretty broad rule you're asking for, in other words. No, Your Honor. With the amalgam of all these different factors that's in front of her, this is enough for her to say he's a risk to others. The more specific you make this case, the harder it is to find clearly established law. Your Honor, would you like me to answer that? Yeah. Okay. No, Your Honor, because Richco establishes this. You have somebody that has assaultive tendencies, has mental health issues, now you need to inquire further what's going on with this guy because he could assault other officers or inmates and that's what happened. Come back in three minutes? Fifteen? Any other questions? No. You'll have your rebuttal. May it please the Court, Mr. Pugh, Jeff Mando, on behalf of the Applees, Timothy Sterling, and Sergeant Gunkel. This case is somewhat unique in that when we litigated and undertook discovery, we were all proceeding under the Farmer v. Brennan test. When we argued the despised of motions, Brawner came down in September of 21, so we did have the opportunity to address the impact of that decision. So what do we do? So we have two prongs to qualified immunity. Prong one is was there an unconstitutional act? Do we apply the four-part test from Westmoreland to decide whether what was done was unconstitutional or not? And then for clearly established, obviously we have to look at the law at the time, right? We can't look at Westmoreland. Correct. So how do we do it? I'm not even sure how to do that. Can it be clearly established at all? I don't think it can be, Your Honor. I think that with Westmoreland coming down in March of this year. But the standard became in some sense more plaintiff-friendly, let's say, and if you could show that it was clearly established under Farmer, let's say, or whatever, under the pre-regime, which was a little confusing, but if you could do that, couldn't you still survive then? Because if an officer was on notice that their conduct was intentional or problematic, they would surely survive the current test, right? Correct. I mean, I think it is theoretically possible to say that the law was clearly established. I disagree with this based on Richco. I disagree strongly that Richco clearly established the law in November of 18 when this occurred. But then we could also prevail under the reckless disregard standard in Westmoreland in terms of whether or not there was a constitutional violation in the first place under a failure to protect theory. I think we could proceed in either. But I think that the facts in this case, when you look at what happened, and the material facts are not disputed. It's a question of what they mean and what their implications are. There's no dispute as to the timelines and the cell movements and what Rebecca Sterling did or what Chris Gunkel did. So the material facts are really not disputed. It's what's their implication. And from any vantage point, what Rebecca Sterling cannot be considered to be a reckless disregard for the safety and security of Chris Stein. Do you agree that she made a mistake or that she should have done something different in hindsight? In hindsight, I can always say that I think it would be nice to add this in or add that in. But when you look at it, it's a pretty big omission, wasn't it? I mean, the guy was dangerous, right? He had been fighting police officers. That night he was dangerous. Why was that noted somewhere on the file? It wasn't. I can't say that it was. There was a reference in the warrant of him being warranted for an assault. And then at 5 a.m., she got the citation and entered the charges, the additional charges from what happened at the hospital, which was a charge of menacing and a charge of resisting arrest. So folks when they're arrested sometimes may resist law enforcement or security, but that doesn't necessarily obligate and translate and say, well, therefore, there are risks to other inmates within the facility. The other thing that's important here is the distinction between the booking classification that takes place when inmates are coming in at night. You're trying to process them into the system. You're trying to do your job the right way. At Boone County, there's a security classification that has to be done by a shift commander within 72 hours, and that's done. In this particular case, this assault occurred within less than 20 hours after Mr. Stein had been admitted to the Boone County Detention Center. Mr. Webster was placed in a cell by himself. He was no threat to anyone at that time. He was in there on suicide watch. He was checked regularly. Medical had to clear him from suicide watch before he could be moved and put into another cell. Medical cleared him, and they didn't make any note or express any concern, and there's no evidence in the record of that that he was assaultive at the time. They normally do that? Is there anything in the record that suggests that they would normally undertake that? As part of their assessment, yes. As part of a medical assessment, when they're trying to determine whether or not someone is coming off suicide watch, that would be something that they would consider. It would be something, and if it was expressed, they certainly would have an obligation to note it. I think your friend on the other side, I guess his point is, but it was Sterling was the one who was supposed to note at the beginning that there were some violent tendencies and there were problems or whatever it was, and that, yes, later they made a decision to say, okay, take him off of medical watch, which makes sense because if that's the only thing they think that he's being held in isolation for, and they look at him and say, okay, well, that one's not a problem, put him back in with other people. I mean, that seems like a red herring to me. I mean, it still goes back to whether she, whatever mistake she made, if she made one at the time, rises to the level of recklessness or whatever it is, It's the reckless disregard. What they want to do at best, this is a negligence type action, because they're saying she could have and should have put in this assault reference, but that's a negligence standard. Reckless disregard, even under Westmoreland, is still a much higher standard than negligence. She intentionally placed him after medical assessment, she intentionally placed him in the cell by himself. How do you prove recklessness? You say, here's all the information the person had, and, you know, in the face of this mountain of evidence, they made a certain decision that was, and then you would instruct the jury, I guess, on what the standard is for recklessness. I mean, I don't know why. Why is that not met here? It isn't met here because of, as I read, and again, I'm going to go back to, this all started when Brawner came down, with all due respect. But I think we had a clear delineation of what we had to show, what a plaintiff had to show, what the defense was in these 1983 cases. The law was pretty clear. But then Brawner came down, and we have struggled since then trying to interpret what that meant. We knew it lowered the standard, it lowered the bar for the plaintiff, but interpreting that language in Brawner in terms of what reckless disregard meant has been a challenge. Westmoreland comes along and kind of changes the test, you know, puts it in the context of a failure to protect type theory, and so we're struggling with how to determine what that means. The only thing we know it means is it's more than negligence. It's got to put someone at substantial risk of serious harm. It's got to be compared in an objective standard to what a reasonable deputy would do, such that if they failed to act, the outcome was obvious. Maybe the Supreme Court will just clarify it for all of us. I'm hoping. But if we go back to Judge Nalbandian's question, he sort of, you know, there's two ways you can win, right? No constitutional violations are not clearly established. Which argument do you think is stronger, and why? I think the strongest argument, the law was not clearly established. I think that we have to go back to November of 2018, and at that point, Farmer v. Brennan was the law. Plaintiff can't have his cake and eat it too. He can't say that Westmoreland governs this case now and lowers the bar, but that Westmoreland. That's right. So he says Richco. He says Richco clearly established that the conduct here was unconstitutional. And Richco is night and day from this case. Why is that? I think you've kind of picked up on that. You'll probably say it better. Why is that? I think it's different because in that particular case, Richco was a bus driver with a knife. He was bipolar and schizophrenic. He had been in the hospital six times for mental health evaluations. He had over 2,000 mental health visits. There was a lull in time where they knew something was going on in the cell, from what the deputies were saying and the nurse told the deputy, and they ignored it for something like 10 minutes while this was going on. All of those factors are clearly different. In that particular case, too, he had been housed in that facility for, I think, seven or eight days. We're talking about someone who had something less than 20 hours. They had been housed together in that particular case after about eight days in Richco. So Richco, especially when we look at what the Supreme Court has said on qualified immunity, it has to be clearly established in a particularized sense. It can't just be a general principle. So Richco would not give fair warning to my clients and to any reasonable officer at seeing that their actions violated Charles Stein's constitutional rights. Mr. Maddox, I want to go back to the constitutional violation part for just a second. I'm trying to figure out what significance to draw, if anything, that Gunkel changed the classification that Sterling initially imposed. So he sees that this guy is in a high-risk cell, but he wasn't classified as high-risk, so he changes it to high-risk. He didn't change it, Your Honor. What happened was Rebecca Sterling, there's a drop-down box, and she just forgot. She put him in a high-risk cell. He was on suicide watch. The cell checks were being done. She just forgot to check the drop-down box saying high-risk. He went in, saw that, and just checked the drop-down box. His classification wasn't changed. He was high-risk. I thought he changed it from something called pre-classification to high-risk. Pre-classification is what it is automatically, and then he went in and put high-risk because that's what it was. He didn't assess and change her classification. But the point is he checks high-risk. Correct. Now, had Sterling done everything that the plaintiff says she should have done initially, would the result have been the same? He would have then been classified as high-risk rather than suicidal? Correct. So I'm not sure whether this goes to the question of whether there's a constitutional violation or causation, but assuming that she made a mistake, assuming that it was more than negligent, didn't it sort of become no harm, no foul by the change that was made by Gunkel before anything happened to Stein? I'm not sure if you could make that argument stronger for Gunkel or if it's stronger when Sergeant Berry changed it from high-risk to detox after medical had cleared him later in the afternoon, like at 5.21 p.m. Well, forget Berry because Berry isn't sued here. I understand that, but that goes to the causation. I'm just trying to figure out why Sterling is liable here for something that happened after her arguable mistake gets corrected. That's all I'm trying to figure out. That's our argument. We argue that that's right. Is high-risk means only at risk to yourself, or is it high-risk meaning you're also a risk to other people? It could be a risk to other people. Under the initial classifications, Your Honor, high-risk encompasses could be someone that's homicidal, could be someone that's suicidal. It encompasses several different categories. Does high-risk alone tell you? In other words, my understanding is that he was high-risk when it's changed, but that the interpretation of that was that he was high-risk because he was possibly suicidal, and once they did an evaluation and said he's not, they took the high-risk category out, right, and put him in the other cell. In other words, if he had been high-risk because he posed a high risk of danger to others, they would never have taken him out of the cell, right? Until he would have been gone through the security classification by the shift commander, yes. Well, high-risk cells include the category of people who are combative or assaultive. Now, that isn't why she put him in a high-risk cell, but people in a high-risk cell could fit that category, right? Correct. The testimony in it says she was put in a high-risk cell because of the suicidal ideations that had been expressed and because medical had expressed that opinion, and she relied on medical on that. I think it also bears, and these facts are undisputed, that when he came in, he was not assaultive when he came in during the booking process. He had a laceration on his head with staples, but that was not indicative that he was a threat to anyone else. He was in a wheelchair. Deputy Vaskey brought him in. He expressed no concerns that Mr. Webster was going to be assaultive or a threat to anyone there. She did have the citation with the warrant, okay, and she learned about the— All of this goes to whether she was reckless or not then? Correct. I mean, you could certainly tell a jury, look, he was in a wheelchair. She had no reason to believe. I mean, I don't know why there may not be enough here to get to a jury, but I don't know. Let me ask you about causation for a second. Do you interpret that prong for is that but-for causation or does that include proximate causation? I haven't given that aspect of Westmoreland the way it was worded. Give me one second. Are you challenging causation? I think it's but-for. Just but-for? It would help you if it included proximate, I think, right? Well, then I guess it would be proximate. I don't know. Okay. But I think we've got the qualified—Judge Bunning here looked at this from both angles, and he first said there's no constitutional violation. He analyzed the case using the Bronner standard. On that question, you think the standard is recklessness, not intentional? Because Westmoreland says intentional act. Can you be reckless without being intentional? Is recklessness a lower standard? Recklessness is a lower standard than intentional. Yeah. So how do we reconcile that first part of the Westmoreland test? And that's the challenge we're having is trying to interpret this test that was adopted from the Ninth Circuit, as I understand it, and trying to get our hands around it as practitioners. I understand. I can use— I understand it's partly our fault. Yeah. So it does say intentional. But Judge Bunning also looked at this at the qualified immunity analysis, and I think he nailed that and found that qualified immunity, again, looking at the purposes of qualified immunity, not giving it short shrift. You know, my folks weren't plainly incompetent. They did a good job. They put him in a cell. He was alone. He wasn't a risk to anyone. I mean, under Westmoreland, my reading of Westmoreland is the intentional part, like putting him in the cell or whatever. They clearly intended to do that. I mean, that would be fairly watered down because it would be— prong one, which is the defendant made an intentional decision with respect to conditions under which plaintiff was confined. I mean, that would almost always be satisfied in cases like this one. I mean, that seems to be meaningless. I don't know. Okay. Anything? Any other questions? Okay, great. Thank you. Rebuttal? So first, it's not in the record on whether or not the mental health people could actually reclassify. That's not in the record, and I don't believe that they could. Next, if we're talking about timing, we can look at Clark v. Murphy. We can look at Clark v. Murphy versus Fourback, Young. When you have a constitutional violation, multiple people can violate those people's constitutional rights, right? They don't have to be there for the harm. They can light the fuse, walk away, the bomb goes off. They don't know who's going to get hit. And that's what happened here. What we're saying is that Sterling had an opportunity to rectify this. Well, I mean, this goes to the question of causation. I mean, you can have intervening causes. You can have multiple causes. You can have all kinds of different chains or whatever. I mean, we have Sterling at the front end, but, I mean, there are some intervening actors, right? I mean, people that look at the file, people that make assessments. I mean, I would assume she's a but-for cause under your theory. Is she a proximate cause as well? Yes. Yes. If we take, this is where I'm going to do the pawn sacrifice. Dunkel says I can't reclassify anyways. So if you can't reclassify, neither can the mental health person except to release them from the high risk. Because high risk, and I just looked at this, high risk can be for special medical needs. It can be for suicidal or mental health needs. Webster was rolled in in a wheelchair with staples in his head and a busted knee. That's why he's in a wheelchair. That's why he's in high risk. Now, I don't know, maybe Dunkel dropped him down to high risk suicidal ideation. Mental health says, hey, are you still suicidal? No. Okay, boom, you're out. Oh, we didn't know that he was assaultive too, and he assaults Stein. Why didn't you sue the medical professional who did the evaluation initially, who said high risk only because of suicidal tendencies and not for any other reason? They couldn't reclassify. No, but just at the very beginning. If this all got, I mean, to Judge Nalbanian's point, there's a lot of actors here. Does the first fault lie at the feet of the professional who did the evaluation? Because Sterling writes medical observation is the reason for high risk, right? Yeah. So the people who did the medical, my point is the people who did the medical observation, why didn't you sue them? And couldn't, wouldn't those people have had some role in saying this is a very dangerous person and locked them up by themselves? They don't have that information in front of them. If you're talking about medical, all they're doing is evaluating his medical abilities, whether or not he's okay. Mental health is just saying, hey, are you going to hurt yourself? No? Okay, boom, you're released. You're saying that's all they do. Yeah. If they knew the person was, if during the entire interview they said that person said, I'm going to kill my cellmate, they don't take that into consideration? I've got 16 seconds, and I do want to say. You've got more than time, but just go. Okay. They don't get a chance to reclassify. It's Sterling classification. No, they can't reclassify, but couldn't they be doubly classified, or couldn't they say on their notes, you know, high risk for this, but also high risk for that? But why even have this classification in the beginning, at the booking? Well, that's what they were doing, because initially they had to put them separate. Why does he even have a duty to, you know, why is he supposed to look at whether or not he's assaultive? You're almost turning the initial booking, which is get them out of the booking area into a place to hold them, into the 72-hour classification. You're coming very close to saying you should do everything for the 72-hour classification at the very beginning when they walk in the door. What's readily apparent to you, yes. And all this information was readily apparent or readily available. I still need to get to the clearly established issue that you guys raised. Do I have time to? Real quick. Okay. So Westmoreland, Green, Trozzi, all those cases, all those facts happened before Brawner. But we didn't say clearly established. We were just saying this is modifying the test under which we look at deliberate indifference.  But all those cases, they didn't say that, oh, well, you lose, and we're just looking at this under a farmer analysis because Brawner came out just in 2021. Well, Westmoreland is remanded. Right. And they're going to deal with clearly established on remand, I assume, right? I mean, I think that it remains to be seen whether clearly established can be established in Westmoreland, right? That's the way I read it. I mean, I don't know that there's a remand. They didn't say in Westmoreland, and this was clearly established. We have a four-part test. I mean, look, we can say something was unconstitutional and say it wasn't clearly established. And so going forward, it doesn't help your client, I understand. But going forward, it helps, you know, the rest of the circuit. Well, Brawner and Green both remanded, and they still applied the new test under Kingsley. And that's why I'm saying this test is just a modification. It's not about clearly established. Now, in terms of, like, the fact pattern that Westmoreland has, yeah, that's clearly established because we're talking about the facts, right? But then you've got to use the Westmoreland standard or the Brawner-Kingsley standard. Okay. Judge Labanian gets it. I think I get it. Because in TRIZE, I just pulled it up, we say with an eye on pre-Brawner precedent, we say we agree with TRIZE, the pre-Brawner case law controls here. That's appropriate focus. You're saying it's only on a factual basis? Yes, because you're still modifying the test. Westmoreland, Green, Brawner. Current test, but the test. Yeah, I know I'm having a hard time, too, Your Honor, but that's what I got. Okay. Great. Thank you. Thank you. Thank you both for your briefs and your arguments, and we will issue a decision in due course. Thank you, Your Honor.